## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **CHESTER SCOTT,** | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Case No. 05cv731 RWT |
| | * | |
| **MICHAEL O. LEAVITT, SECRETARY** | * | |
| **U.S. DEPARTMENT OF HEALTH &** | * | |
| **HUMAN SERVICES**, | * | |
| | * | |
| Defendant | * | |
| | * | |

## <u>MEMORANDUM OPINION</u>

On March 15, 2005, Chester Scott ("Plaintiff"), an African American man employed by the U.S. Department of Health and Human Services ("HHS"), brought this suit against Tommy G. Thompson,[1] alleging employment discrimination based on his race, color, and national origin.  <u>See</u> Paper No. 1.  On December 6, 2005, Defendant filed a Motion to Dismiss or, in the alternative, for Summary Judgment.  <u>See</u> Paper No. 19.  On December 12, 2005, this Court scheduled a hearing on the Defendant's motion for April 3, 2006, but this date was later rescheduled by consent to Monday, May 22, 2006.  On December 21, 2005, the Court granted a Consent Motion extending the time for the Plaintiff to file an opposition to the Defendant's motion until January 25, 2006.

In his opposition, Plaintiff made no mention of the need to conduct any discovery pursuant to Federal Rule of Civil Procedure 56(f) in order to be able to adequately respond to Defendant's motion.  However, on Sunday, May 21, 2006, the Plaintiff electronically filed a Motion for Leave of Court to File Rule 56(f) Affidavit.  Attached to the motion was an affidavit of the Plaintiff setting

---

[1] The Complaint named Tommy G. Thompson as the Defendant in this case.  Pursuant to Fed. R. Civ. P. 25(d), Michael O. Leavitt, the current Secretary of the U.S. Department of Health and Human Services has been automatically substituted for Thompson as Defendant to this action.

forth, in detail, discovery which he alleged was needed, including the submission of document requests and the taking of depositions.  His affidavit specifically stated that without the information that he intended to develop through discovery, he would be prejudiced because "I will not be able to prove that the Defendant did, in fact, discriminate and harass me based upon my race" and that he will "not be able to prove that Defendant's proffered legitimate non-discriminatory reasons are but pretext for illegal discrimination."  See Paper No. 29.

Based upon the papers filed by the parties prior to May 21, 2006, the Court had been prepared to grant Defendant's motion.  However, relying upon the Plaintiff's last-minute motion, and  representations made by the Plaintiff in his affidavit and by his counsel, the Court denied the Defendant's motion to the extent that it sought dismissal or summary judgment as to claims based on Plaintiff's race.[2]  But for the representations made as to the need for discovery, the matter would have been decided on May 22, 2006.

One would have thought a representation by counsel, supported by an affidavit from his client, would have been considered a rather serious matter, and that the opportunity given to the Plaintiff to engage in the requested discovery would have been pursued.  It was not.  A scheduling order was entered by the Court on May 22, 2006, which provided for a discovery deadline of October 4, 2006.  At no time was any effort made to modify the Scheduling Order to extend the time for the completion of discovery.

---

[2] By consent of both parties, the motion was granted as to the Plaintiff's claims of discrimination based on color and national origin.

This Court's Scheduling Order requires that the <u>parties</u> file on the day of the discovery deadline a status report which shall include the matters set forth therein.  On October 4, 2006, the Defendant, without participation by the Plaintiff, submitted a status report advising the Court that, notwithstanding the Plaintiff's affidavit, and a motion signed by his counsel, <u>no discovery</u> was requested by the Plaintiff.  <u>See</u> Paper Nos. 34 and 35.

On November 3, 2006, the Defendant filed a second Motion to Dismiss or, in the Alternative, for Summary Judgment.  <u>See</u> Paper No. 36.  The Plaintiff, once again, requested additional time to respond to the Defendant's motion and, by consent of the Defendant, this Court granted an extension of time to him.  In the Plaintiff's Opposition filed on December 5, 2006, no explanation was given then, nor has one ever been given, as to why the urgently requested discovery sought by the Plaintiff never took place.  <u>See</u> Paper No. 40.

Under Local Rule 105.6, no hearing is required on the Defendant's motion.  The parties have expressly consented to a ruling on the motion without a hearing; but even if one had been requested, that request would have been denied, because the Court heard essentially the same arguments at the hearing on the Defendant's first motion.  Accordingly, the Court now rules on the Defendant's motion.

## FACTUAL BACKGROUND

At all times relevant to this action, Plaintiff held the position of Statistician, GS-13, in the Mortality Statistics Branch ("MSB"), Division of Vital Statistics, at the National Center for Health Statistics ("NCHS"), Centers for the Disease Control and Prevention ("CDC") in Hyattsville, Maryland.  Dr. James Weed was the Deputy Director for the Division of Vital Statistics, Acting Chief of MSB, and Plaintiff's acting first-line supervisor.

On March 16, 2001, CDC posted a vacancy announcement for a Supervisory Statistician in the MSB.  Several people applied for this position, including Plaintiff and Dr. Robert Anderson. Ultimately, NCHS was not permitted to fill the position, as part of an effort to eliminate excessive supervisory positions.  On August 17, 2001, the CDC posted a new vacancy announcement, for a Lead Statistician.  The main distinction between the two positions was that a Supervisory Statistician was in a main supervisory role, while the Knowledge, Skills, and Abilities ("KSAs") needed to be successful in the Lead Statistician position focused mainly on technical skills.

Plaintiff, Dr. Anderson, and Dr. Donna Hoyert[3] each applied for the Lead Statistician position.  Dr. Weed was the first-line supervisor for all three candidates.  He enlisted a panel of three other senior statisticians in NCHS to aid in the interview and selection process, and prepared a set of seven standard interview questions for the panel.

After all the interviews were completed, the panel met and discussed the applicants.  The panel unanimously believed that Plaintiff was a "distant third choice" for the position.  Based on the panel's recommendation, Dr. Weed ultimately selected Dr. Anderson for the position.

On December 12, 2001, Plaintiff met with John S. Gardenier, an EEO Counselor, to begin formal EEO counseling.  Mr. Gardenier ultimately issued a report in which he concluded that there was racial discrimination in the case, but he did not attribute it to "racist attitudes or intent."  Mr. Gardenier stated that the vacancy announcement was tailored to Dr. Anderson, the job required credentials beyond the articulated KSAs, mentoring and guidance were provided to Dr. Anderson, and the negative reviews of Plaintiff were counterfactual.

---

[3]  Like Plaintiff and Dr. Anderson, Dr. Hoyert was also currently working as a GS-13 Statistician.

After Mr. Gardenier issued his report, Plaintiff filed a formal complaint with the EEOC; on April 24, 2002, the agency accepted his claim for investigation. Following the investigation, Plaintiff elected a hearing before the EEOC. After a hearing that lasted several days, Administrative Judge David Norken determined on October 27, 2004 that there were no material facts in dispute, found that Plaintiff was not the victim of racial discrimination, and entered judgment in favor of the Defendant.

## ANALYSIS

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "A material fact is one that 'might affect the outcome of the suit under the governing law.'" Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party, Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 302 (4th Cir. 2006), however, the non-moving party "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256.

In employment discrimination cases without direct evidence of intentional discrimination, the Court uses the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). In order to prove a *prima facie* case, Plaintiff must prove that: (1) plaintiff is a member of a protected group; (2) plaintiff applied for the position in question; (3) plaintiff was qualified for the position; and (4) plaintiff was rejected for the position under

circumstances giving rise to an inference of unlawful discrimination.  Carter v. Ball, 33 F.3d 450, 458 (4th Cir.1994). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision.  Evans v. Technologies Applications & Service Co., 80 F.3d 954, 959 (4th Cir. 1996).  If the employer meets this burden of production, the burden shifts back to the plaintiff to show that the given reason is merely a pretext for discrimination.  Id.

In the instant case, Defendant concedes that Plaintiff has established a *prima facie* case of discrimination.  The Defendant, however, contends that that Dr. Anderson was chosen for the position because he was eminently more qualified than Plaintiff.

Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision.  Evans, 80 F.3d at 960.  For the lead position, Dr. Weed rated each of the candidates based on five KSA factors, along with their performance during the interview.  The announcement for the position identified the following KSAs needed to carry out the duties of the position:

1.  Knowledge of statistical theory and methodology relating to demography, life table construction and epidemiology.

2.  Skill in analyzing data and writing technical reports.

3.  Ability to utilize computer programs using standard packages for statistical analysis and presentation.

4.  Knowledge of the mortality component of the National Vital Statistics System.

5.  Ability to work with peers and senior management to plan, solve problems, and negotiate for resources. Ex. A at Tab 15.

The panel believed that both Plaintiff and Dr. Anderson were equally proficient in utilizing computer programs for statistical analysis and presentation, as well as in their abilities to work well

with others, solve problems, and negotiate for resources.  The panel, however, found Dr. Anderson far superior in the three remaining KSAs.

Dr. Anderson had a doctorate in demography, and publications and presentations in the field, in addition to significant work experience in life table construction by working on the annual U.S. life table program.[4]  In comparison, Plaintiff had a bachelor of arts in Mathematics, was working toward a Master's of Science ("M.S.") in Health Services Administration, and did not have much knowledge or experience with life table production.

Moreover, the panel also found that Dr. Anderson's skills in analyzing data and writing technical reports were superior to Plaintiff's.  Dr. Anderson had more than 20 publications and 20 presentations listed on his application, and was a peer reviewer for ten professional journals.  In contrast, Plaintiff is not a peer reviewer for any professional journals, and his application only listed three publications and nine presentations.  Beyond Plaintiff's application, Dr. Weed, as Plaintiff's current supervisor, had occasion to review Plaintiff's past manuscripts, and believed they reflected poor grammatical skills and organizational ability, and were generally in need of serious repair.

Furthermore, Dr. Anderson had six years of experience of working within the mortality component of National Vital Statistics System.  Plaintiff, however, had worked nearly exclusively on the 1993 National Mortality Followback Survey.[5]

Clearly, Defendant has met its burden of production under McDonnell Douglas, as the foregoing reasons are all legitimate, non-discriminatory reasons for Defendant not to select Plaintiff

---

[4]  Producing life tables involves significant expertise.  Dr. Weed found this requirement to be particularly important, because otherwise he would be left with the responsibility of constructing life tables.

[5]  In addition to the KSAs, the panel believed Dr. Anderson performed better during the interview than Plaintiff, answering the questions more completely, accurately, and convincingly.

for the position.  In rebuttal, Plaintiff argues that he was in fact more qualified for the position; Plaintiff, however, points to no evidence that he should have been selected based on the articulated KSAs.  Instead, Plaintiff contends that his seniority at the Branch, pursuit of a M.S. in Health Services Administration, and greater managerial experience with contractor personnel made him more qualified for the position, particularly for the alleged managerial aspect of the work.[6]

Although a plaintiff can prove pretext by showing he is better qualified, Heiko v. Colombo Savings Bank, F.S.B., 434 F.3d 249, 259 (4th Cir. 2006), a plaintiff cannot establish pretext "by relying on criteria of [his] choosing when the employer based its decision on other grounds." Anderson 406 F.3d at 271.  Plaintiff's opinion as to what should been important for the selection process is immaterial.

Plaintiff alternatively argues that the job posting itself was discriminatory.  He alleges that the withdrawn Supervisory Statistician position was more suited to Plaintiff's managerial and supervisory skills, and that Defendant wrote the new position of Lead Statistician with KSAs purposefully crafted to ensure Dr. Anderson received the position.  Defendant denies preselecting Dr. Anderson for the position; however, even if Dr. Anderson had been preselected for the position, preselection alone is not itself a violation of Title VII.  See Kennedy v. Landon, 598 F.2d 337, 341 (4th Cir. 1979); see also Blue v. U.S. Dep't of Army, 914 F.2d 525, 541 (4th Cir. 1990) (noting that preselection works to the detriment of all other applicants, regardless of race); Balazs v. Liebenthal, 32 F.3d 151, 159 (4th Cir. 1989) ("Title VII [does not] authorize[] courts to declare unlawful every arbitrary and unfair employment decision.").  In order to prevail under this theory, Plaintiff would

---

[6] Plaintiff also claims that because the position inherently involved managerial and supervisory duties, Dr. Anderson's doctorate degree should not have been stressed for his selection.  Additionally, he insists that life tables have been a standard product of the MSB for years, and therefore should not have been an important factor in selection.

-8-

have to submit evidence that Dr. Anderson was preselected *because he is white*.  Defendant has provided not even a scintilla of evidence in that regard.[7]  Therefore, the Court likewise finds this argument without merit.[8]

Finally, Plaintiff relies on Mr. Gardenier's opinion that racial discrimination occurred.  Mr. Gardenier's role as an EEOC counselor is to resolve claims of discrimination without the filing of a complaint.  *See* 29 C.F.R. § 1614.105 ("Aggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age or handicap must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter.").  As a pre-complaint mediator, Mr. Gardenier has no role as a finder of fact.  Indeed, after a lengthy hearing, Mr. Gardenier's opinion was rejected by Administrative Judge Norken.[9]  And most importantly, neither Mr. Gardenier's opinion nor Judge Norken's finding are dispositive in the instant suit.  *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 n.21 (1974) (noting, in the context of the weight given to arbitral decisions, that "courts should ever [be] mindful that Congress, in enacting Title VII, thought it necessary to provide a judicial forum for the ultimate resolution of

---

[7] Defendant's sole rebuttal is to point out Mr. Gardenier's observation that, despite EEO complaints, Dr. Weed or Dr. Freedman did not take proactive steps to "level the playing field."  Assuming, *arguendo,* that Mr. Gardenier's observation was correct, this does not prove that the job description was written to purposefully exclude Plaintiff because he is black and hire Dr. Anderson because he is white.

[8] Plaintiff finally argues that Dr. Anderson was groomed for advancement throughout his tenure, while Plaintiff was systematically denied training opportunities that would have made him a more competitive candidate.  He cites Mr. Gardenier's EEOC counselor report, which suggests that racial tensions exist at NCHS, and, at the very least, that there is a perception of racial discrimination among minorities.

In essence, Plaintiff seems to argue that he was subject to a hostile work environment, or that Defendant exhibited a pattern and practice of discrimination.  These claims are clearly outside the scope of the current suit.  Plaintiff is required to exhaust all available administrative remedies on those claims before he could bring a Title VII action in this Court.  See Brown v. General Services Administration, 425 U.S. 820 (1976).

[9] Indeed, the Court may have the discretion to consider *that* finding, which would be adverse to the Plaintiff, see Patten v. Wal-Mart Stores East, Inc., 300 F.3d 21, 27 (1st Cir. 2002), but declines to do so.

discriminatory employment claims.  It is the duty of courts to assure the full availability of this forum.").

**<u>CONCLUSION</u>**

In <u>Brown v. American Institutes for Research</u>, 487 F. Supp. 2d 613 (2007), this Court observed that the circumstances of that case "exemplifie[d] the old adage that 'you can lead a horse to water, but you can't make him drink.'"  *Id*. at 613-14.  In <u>Brown</u>, it was the defendant who led the plaintiff's horse to the water of service of process, but he failed to drink.  Here, it is the Plaintiff who asked for an opportunity to drink the elixir of discovery, in order to demonstrate pretext.  Having been granted that opportunity, he neither came to the water nor drank.  Perhaps the result might have been different had the Plaintiff done so.  But the Plaintiff having failed to do so, the Court finds the Plaintiff's arguments of pretext on this record wanting, and accordingly, will grant summary judgment against him, by separate order.[10]

DATE:  __7/23/07__                                 _____/s/_____

                                                              ROGER W. TITUS
                                                              UNITED STATES DISTRICT JUDGE

---

[10]  The Court is compelled to observe, with considerable disappointment and sadness, that the conduct of counsel for the Plaintiff in this case is open to serious question.  Counsel made a detailed representation to the Court of specific discovery that he required in order to oppose the Defendant's motion, and supported that representation with an affidavit of his client.  The ramifications of such a detailed representation, followed by no discovery whatsoever, would appear to support a conclusion that either the representation of counsel to the Court was not made with candor or counsel was not diligent in representing his client.  *See* Maryland Rules of Professional Conduct, Rules 1.3, 3.3.